## A98A1536, A98A1537. DISMUKE v. ABBOTT; and vice versa.
### (505 SE2d 58)

BLACKBURN, Judge.

Following a bench trial, Diane Dismuke Abbott, as executor of the estate of R. T. Dismuke (Estate), appeals the trial court's finding that Larry Dismuke was not indebted to the Estate for rent on a home he was inhabiting. Larry appeals the trial court's findings: (1) that Larry was indebted to the Estate for rent on a storage shelter; (2) that Abbott, as administratrix, was not accountable for not renting certain real property held by the Estate; (3) that Larry acted unreasonably in failing to close an agreement with Abbott to buy certain residential real property held by the Estate; and (4) that certain bearer bonds were the property of the Estate. Because they arise from the same origin, Abbott's appeal and Larry's appeal have been consolidated herein for review.

Now in its third appearance before this Court,[1] this case concerns the troubled administration of the estate of R. T. Dismuke. R. T. died on August 22, 1988, survived by his wife, Greta, and his four children, Diane Dismuke Abbott, Robert Larry Dismuke, Keith Dismuke, and Debbie Dismuke. Greta died in May 1991, and Larry became the executor of her estate. On March 15, 1993, Abbott, acting as administratrix of the estate of her father, filed for a declaratory judgment to determine whether certain assets belonged to the Estate. In this action, Abbott contended, among other things, that her brother Larry had inappropriately taken assets belonging to the Estate. Larry, in both his individual capacity and as executor of Greta's estate, counterclaimed, alleging, among other things, that Abbott had mishandled their father's estate. After a bench trial, the trial court, in a 35-page opinion, carefully considered 14 different points of contention between the parties. Both parties now appeal, contending that the trial court made numerous errors.

As an initial matter, we must note that "[t]he findings of fact in a nonjury trial are analogous to a jury verdict and will not be interfered with if there is any evidence to support them." *Lowry v. Hamilton*, 268 Ga. 373, 374 (2) (489 SE2d 827) (1997).

1. Abbott contends that the trial court erred in finding that Dismuke was not indebted to the Estate for rent accruing from September 8, 1995 on Estate property located at 202 E. Franklin Street. We agree.

At the time of her death, Greta had a life estate in this property,

---

[1] In *Dismuke v. Dismuke*, 195 Ga. App. 613 (394 SE2d 371) (1990), we approved the appointment of Diane Dismuke Abbott as administrator with the will annexed of R. T. Dismuke's estate. In *Dismuke v. Abbott*, 217 Ga. App. 524 (457 SE2d 837) (1995), we determined the ownership of certain revocable trust accounts not in issue in this case.

and Larry was living with her. After Greta died, this house became property of R. T.'s Estate; however, Larry remained in the house and continues to reside there. Initially, Larry paid no rent to the Estate. Abbott then brought suit against Larry, and, on October 28, 1994, a jury awarded back rent to the Estate in the amount of $12,350. On October 28, 1994, the trial court ordered Larry to vacate the property within 30 days, but he remained therein, and controversy concerning rent owed to the Estate continued. On December 5, 1994, the Estate notified Larry that rent was accruing as of that month on both the house in which he was residing, in the amount of $450 per month, and a storage shelter behind the house, in the amount of $200 per month. On September 8, 1995, the parties appeared in trial court on the Estate's motion to evict Larry and announced that they had reached an agreement whereby Larry would buy the residential real property held by the Estate, including the house in which he was living. Both parties concur that this agreement is valid and enforceable against them. At that hearing, Larry's counsel claimed that his client would carry out the sale within two to three weeks. At the present time, the sale remains unconsummated.

Based on these facts, the trial court concluded that, as of December 1994, an implied tenancy at will was created, whereby Larry agreed to rent the house and storage shelter for $650 per month. Larry does not appeal this finding, at least with regard to the house. The judge further found, however, that the purchase agreement entered on September 8, 1995 terminated this landlord-tenant relationship. As such, the trial court determined that Larry did not owe rent to the Estate following this date. We must disagree.

While it is true that "[w]here a party enters upon land under a contract of purchase, landlord and tenant relationship does not come into existence," *MacKenna v. Jordan*, 123 Ga. App. 801 (1) (182 SE2d 550) (1971), Larry was already occupying the property in question as a tenant on the date that the sales agreement was reached. At no point during the hearing at which this agreement was related to the court were there any discussions regarding the termination of Larry's rental responsibilities. Rather, the discussion centered only on the basic terms of the sale, which Larry's counsel indicated could be closed in a matter of weeks. Furthermore, there is no evidence that either party attempted to terminate the tenancy at will subsequent to September 8, 1995 pursuant to OCGA § 44-7-7. As such, there is no evidence that the agreement to sell the property terminated the tenancy, and the rental agreement must be considered separate and distinct from the sales contract. Accordingly, the tenancy at will between Larry and the Estate remains until appropriately terminated, and Larry is liable to the Estate for rent accruing after September 8, 1995.

2. Larry contends that the trial court erred in finding that he was indebted to the Estate for rent on a storage shelter located behind the home in which he was residing. We disagree.

The trial court found that Larry actually used the storage structure, even though he claimed that he did not. Evidence was presented at trial that Larry stored certain items in the storage house and that he used the structure as a workshop. Furthermore, as with the house at 202 E. Franklin Street to which the storage facility was appurtenant, Larry became a tenant at will of the storage structure pursuant to his continued use thereof following the Estate's December 5 letter. Accordingly, there was sufficient evidence to support the trial court's determination that Larry was indebted to the Estate for rental of the storage facility. In addition, Larry remained liable for such rent following the sales agreement on September 8, 1995. See Division 1, supra.

3. Larry contends that the trial court erred in finding that Abbott, as administratrix, was not accountable for not renting Estate property located at 410 North Madison Avenue, arguing that the Estate lost money because insurance on the house was significantly more expensive due to its uninhabited state. We disagree.

Although a personal representative has a general duty to preserve and protect the value of an estate, there was some evidence produced at trial supporting the trial court's determination that Abbott had not breached such duty by not renting the house in question. Evidence was produced at trial showing that this house lacks a working kitchen and has no central heating and air. Furthermore, Abbott testified that significant repairs would have to be made to the house to restore it to a habitable condition. In addition, the trial court found that Larry contributed to the Estate's failure to rent the property. The record supports this finding, as, among other things, Larry admitted to using the driveway of this property for parking his cars. Although Larry contended that the house could be rented, he had no proof of the conditions inside the structure. As there was some evidence supporting the trial court's decision, we affirm its finding that Abbott was not accountable for failure to rent this property.

4. Larry contends that the trial court erred in finding that he acted unreasonably in failing to close his agreement with Abbott to purchase the residential real property of the Estate. We disagree.

The parties entered into an agreement for the sale of the property at a hearing on September 8, 1995. At the hearing, Larry's attorney announced to the court that he envisioned closing the transaction within a matter of weeks. Subsequently, Larry refused to close the transaction, raising numerous problems with the form of the deeds drafted by the Estate's attorney. The trial court found that, although some of these criticisms may have been valid, they were

more likely a method by which Larry "stonewalled" the transaction. Letters between the parties' attorneys support this conclusion. In response to Larry's criticisms, the Estate even offered to allow Larry to draft the deeds as early as November 1995. In February 1996, after Larry complained further, the Estate again offered to let him draft the deeds. In addition, Abbott produced signed and notarized deeds at trial. Therefore, as there was some evidence supporting the trial court's finding that Larry acted unreasonably in failing to close the purchase of the Estate property, we must affirm it.

5. Larry contends that the trial court erred in finding that certain bearer bonds were the property of the Estate. Again, we must disagree.

R. T. bought certain bearer bonds worth approximately $140,000 through one of his brokerage accounts listed as being held in joint tenancy with right of survivorship with Greta. It was undisputed that R. T. bought these bonds with his own funds. Rather than leave these bonds in the brokerage account, R. T. placed them in a safety deposit box. No owner was listed on the face of the bonds.

The access card to the safety deposit box in which the bearer bonds were placed was originally listed under the names of R. T. and Greta. In 1984, shortly before R. T. entered cancer therapy, Larry's name was added to the list of those allowed to have access to the box. At the time of R. T.'s death in 1988, the bearer bonds remained in the safety deposit box. On April 3, 1989, Larry removed the bearer bonds from the safety deposit box and had them registered in Greta's name. All of these bonds were called before Greta's death, and the proceeds therefrom were received either by Larry or Greta.

Abbott contends that these bearer bonds were the property of the Estate at the time of R. T.'s death. Larry contends that the bonds belonged to Greta at the time of R. T.'s death. As support for his claim, Larry points to the fact that the bonds were purchased through a joint brokerage account and left in a safety deposit box accessible by Greta.

Larry initially contends that the bearer bonds were held as joint tenancy property between R. T. and Greta, pointing to the fact that they were purchased through a brokerage account labeled as a joint tenancy account. However, as noted, R. T. purchased these bonds with his own money, removed them from the joint tenancy account, and left no indication that he wished the bonds to be jointly held. In the absence of any evidence to support a joint tenancy, the trial court did not err in finding that none existed with regard to such bearer bonds.

Furthermore, the court did not err in finding that the bearer bonds were not the subject of a valid inter vivos gift from R. T. to Greta or Larry simply by placing them into the safety deposit box. To

constitute a valid inter vivos gift, the donor must have the necessary donative intent, the donee must accept the gift, and the gift must be delivered or some act which under law is accepted as a substitute for delivery must be done. OCGA § 44-5-80. "A delivery of property subject to be reclaimed by the donor at any time prior to his death, or where full control or power over the property or fund vests in the donee only after the death of the donor, does not constitute a valid gift inter vivos. To make a valid gift, there must be a present intention to give, and a complete renunciation of right, by the giver, over the thing given, without power of revocation, and a full delivery of possession as a gift, inter vivos." (Citation and punctuation omitted.) *Daniell v. Clein*, 206 Ga. App. 377, 383 (2) (425 SE2d 344) (1992).

"Actual manual delivery is not essential to the validity of a gift. Any act which indicates a renunciation of dominion by the donor and the transfer of dominion to the donee shall constitute a constructive delivery." OCGA § 44-5-82. Whether the donor completely relinquished control of a purported gift is a question of fact. *Williams v. McElroy*, 35 Ga. App. 420, 421 (133 SE 297) (1926).

"Given the facts of this case, the [trial court] was authorized to conclude that [R. T.] did not make an inter vivos gift to [Greta or Larry] of the contents of the safety-deposit box. Why? Because [R. T.] retained control of the box. . . . [R. T.] could have removed any of the contents in the box at any time. It cannot be said, therefore, that [R. T.] completely relinquished control of the items he placed in the box." *Daniell*, supra. Accordingly, the trial court correctly determined that the bearer bonds were the property of the Estate at the time of R. T.'s death.

*Judgment affirmed in part and reversed in part. Eldridge, J., concurs. McMurray, P. J., concurs in the judgment only.*

DECIDED JULY 29, 1998 —
RECONSIDERATION DENIED AUGUST 12, 1998 — ■

*Mills & Chasteen, Ben B. Mills, Jr.*, for appellant.
*Solomon & Edgar, William J. Edgar*, for appellee.

